# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

KM ORGANIC FUND, INC., and
CAMMARATA MANAGEMENT,
INC.,

               Plaintiffs,

v.                             Case No. _____

WILLIAM KYLE SMITHSON,

               Defendant.

_____/

## DECLARATION OF JEFFREY K. JOYNER, ESQ.

I, JEFFREY K. JOYNER, pursuant to Tenn. R. Civ. P. 72, do hereby declare as follows:

1.      I am of lawful age, and the matters stated herein are of my own personal knowledge.

2.      I am lead counsel for KM Organic Fund, Inc. and Cammarata Management, Inc. (collectively, "Plaintiffs") in a lawsuit filed in which causes of action are alleged in counterclaims against Defendant William Kyle Smithson ("Kyle Smithson") and others in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida, styled *Virtual Mountain Capital, LLC, Plaintiff, vs. Michael Cammarata, KM Organic Fund, Inc., and Strategic Capital Partners Worldwide, LLC, Defendants / KM Organic Fund, Inc. and Cammarata Management, Inc., Counter-Plaintiff and Third Party Plaintiff, vs. Virtual Mountain Capital, LLC, Christopher Villar, a/k/a Christopher Villan, and William Kyle Smithson, Counter-Defendant and Third Party Defendants*, under the case number 2018 CA 013104XXXX MB (AA) (the "Florida Litigation").

4817-9221-2178

3. Attached hereto as **Exhibit 1** is a true and correct copy of Plaintiffs' *Second Amended Counterclaim and Third-Party Complaint* filed in the Florida Litigation on May 4, 2020 (the "Florida Counterclaim").

4. The Florida Litigation is in the discovery phase. Specifically, the parties have exchanged written discovery and document productions and have commenced fact depositions.

5. The Florida Counterclaim is an action against Kyle Smithson, among others, for permanent injunction, breach of non-disclosure agreements, misappropriation of trade secrets in violation of Florida's Uniform Trade Secrets Act, Fla. Stat. Ch. 688, and conversion.

6. The Florida Counterclaim is a just claim, and seeks a judgment against Kyle Smithson for permanent injunctive relief and damages, together with interest, attorneys' fees and costs, in the estimated amount of at least $300,000.

7. As demonstrated by the sworn testimony of Conservator B. Jo Atwood filed in the Conservatorship of William Herman Smithson, Jr. in the Probate Court for Rutherford County, Tennessee, and by the Orders of that Court, Defendant William Kyle Smithson has fraudulently disposed of his late father's assets. Based upon his past actions, it is likely that Defendant William Kyle Smithson is about to fraudulently dispose of the remaining assets he stands to inherit as the sole heir at law of his father's estate.

FURTHER DECLARANT SAYETH NOT.

I, JEFFREY K. JOYNER, declare under penalty of perjury that the foregoing is true and correct.

*/s/ Jeffrey K. Joyner*_____
JEFFREY K. JOYNER

# EXHIBIT 1

to Decl. of Joyner

IN THE CIRCUIT COURT OF THE FIFTEENTH
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

CASE NO. 2018 CA 013104XXXX MB (AA)

VIRTUAL MOUNTAIN CAPITAL, LLC,

      Plaintiff,

vs.

MICHAEL CAMMARATA, KM ORGANIC
FUND, INC., STRATEGIC CAPITAL
PARTNERS WORLDWIDE, LLC,

      Defendants,

_____/

KM ORGANIC FUND, INC.,
CAMMARATA MANAGEMENT, INC.,

      Counter-Plaintiff and
      Third Party Plaintiff,

vs.

VIRTUAL MOUNTAIN CAPITAL, LLC,
CHRISTOPHER VILLAR, a/k/a CHRISTOPHER
VILLAN, WILLIAM KYLE SMITHSON,

      Counter-Defendant and
      Third Party Defendants.

_____/

## SECOND AMENDED COUNTERCLAIM AND THIRD-PARTY COMPLAINT

Defendant KM Organic Fund, Inc. ("**KM Organic**") and Third Party Plaintiff Cammarata

Management, Inc. ("**CMI**") (collectively, "**Counterclaimants**") hereby file this Second Amended

Counterclaim and Third-Party Complaint ("**Second Amended Counterclaim**" or "**SACC**")

through undersigned counsel against Third Party Defendants Christopher Villar, aka Christopher

Villan ("**Villar**"), William Kyle Smithson ("**Smithson**"), and their jointly owned company,

Plaintiff Virtual Mountain Capital, LLC (**VMC**") (collectively, "**Counterclaim Defendants**"),

and allege as follows:

## NATURE OF ACTION

1.     This is an action for permanent injunction, breach of non-disclosure agreements, misappropriation of trade secrets in violation of Florida's Uniform Trade Secrets Act ("**FUTSA**"), Fla. Stat. Ch. 688, unauthorized misuse and access of Counterclaimants' computers, computer networks, and other electronic devices in violation of the Computer Fraud and Abuse Act ("**CFAA**"), 18 U.S.C. § 1030 *et seq*., and conversion.

2.     This action, along with the corresponding request for permanent injunctive relief, is necessary to protect Counterclaimants, and their clients, affiliates, partnerships and/or managed companies' from the further use and disclosure of information, including trade secrets (defined more specifically below) and confidential, proprietary information, that Counterclaim Defendants wrongfully obtained from Counterclaimants' protected computer systems and that concern Counterclaimants, their clients, affiliated businesses, partnerships and/or managed companies.

3.     Despite having been informed of Counterclaimants' policies protecting such information and having agreed to honor those policies both verbally and in multiple non-disclosure agreements, as well as by their actions of requiring and facilitating other third-parties to execute non-disclosure agreements, Counterclaim Defendants Villar and Smithson illegally accessed, copied, and transferred information of value from Counterclaimants' computer systems to further Counterclaim Defendants' own business and financial interests through their jointly-owned company, VMC, which used such information to enter into an agreement with, and file a lawsuit against, Defendant Strategic Capital Partners Worldwide, LLC ("**Strategic**"), and Counterclaim Defendants are now in a position to continue their wrongful use and disclosure of that information unless they are enjoined by this Court.

## PARTIES

4.     Counterclaimant Cammarata Management, Inc. is a Delaware corporation with its corporate headquarters located in Palm Beach County, Florida.

5.     Counterclaimant KM Organic Fund, Inc. is a Florida corporation with its corporate headquarters located in Palm Beach County, Florida.

2

6.     Counterclaim Defendant Christopher Villar, aka Christopher Villan, is an adult individual believed to be domiciled and residing in Tennessee. Villar is a former independent contractor engaged by both CMI and KMO. Villar executed a non-disclosure agreement with CMI, as well as agreed and understood to maintain all confidential information of Counterclaimants as confidential in accordance with company policy.

7.     Counterclaim Defendant William Kyle Smithson, is an adult individual believed to be domiciled and residing in Tennessee. Smithson executed a non-disclosure agreement with CMI, as well as agreed and understood to maintain all confidential information of Counterclaimants as confidential in accordance with company policy.

8.     Counterclaim Defendant Virtual Mountain Capital, LLC is a Nevada corporation with its corporate headquarters located in Stateline, Nevada. Villar and Smithson are the sole Members of VMC, which they incorporated in 2015 as a holding company for certain investments.

## GENERAL ALLEGATIONS

### Michael Cammarata, CMI and KM Organic

9.     Michael Cammarata ("Cammarata") is a successful entrepreneur who has risen to become the Chief Executive Officer of Schmidt's Deodorant Company, LLC ("Schmidt's") as part of his successful entrepreneurial career in diverse sectors, from entertainment to online commerce, since his teenage years when he founded his first web hosting company and an online advertising network.

10.     CMI is a management company founded by Cammarata that has engaged in business interests including the representation of musicians, actors, writers and businesses in interstate commerce in the United States. CMI applies an innovative multi-media approach to management, building on the use of new technology and its valuable knowledge-management system, which allows CMI to promote and showcase its clients to maximize their revenue potential.

11.     KM Organic is a holding company for investments in companies that manufacture and/or sell organic and natural products, including Schmidt's.

3

12. Counterclaimants and Cammarata receive and are entrusted with sensitive, confidential information from clients, investors, partners, affiliates, companies in which they invest, and companies with which they do business, including employment, financial, corporate, customer and business information.

13. Counterclaimants and Cammarata have expended considerable time, money and resources developing and maintaining proprietary and valuable information protected as trade secrets, all of which were material to CMI's, KM Organic's, and Cammarata's businesses.

14. KMO's trade secrets are comprised of the following (the "KM Organic Trade Secrets"):

    a. KM Organic's investment in Schmidt's, including (i) that KM Organic intended to invest in Schmidt's, (ii) the structure of KM Organic's investment in Schmidt's, (iii) the amount that KM Organic invested in Schmidt's, (iv) the valuation of Schmidt's, (v) the new ownership structure of Schmidt's following KM Organic's investment, (vi) Schmidt's targeted stores and retailers, and (vii) Schmidt's overall business model and strategy for explosive growth;

    b. Schmidt's (i) retail customer identities, (ii) retail customer product requests, (iii) potential retail customer accounts being pursued, and (iv) manufacturing plans;

    c. Offers by investors to acquire Schmidt's or its assets, including (i) the fact that investors were interested in acquiring some or all of Schmidt's (through either stock or asset purchase), (ii) the identities of the potential investors, (iii) the terms of the potential deals, including outside valuations of Schmidt's, sale and investment amounts, ownership structures, and other negotiating positions and deal terms;

    d. The consideration paid by the multi-national company Unilever to acquire certain assets of Schmidt's in a confidential transaction;

4

e. Schmidt's internal financial results, member distribution reports, and cash flow analyses;

f. KMO's and its affiliated companies' confidential corporate structure for Cammarata's businesses, such as KM Organic, CMI, Strategic, and Schmidt's;

g. The KMO trade secrets contained on the Devices (as defined in paragraph 25 of this SACC) that KMO provided to Villar to carry out his responsibilities as Cammarata's executive assistant.

15. CMI's trade secrets are comprised of the following (the "CMI Trade Secrets"):

a. CMI's (i) celebrity client lists, (ii) clients' personalized details, including contact information, upcoming or in-development projects, representation preferences, payment structure, and payment history, (iii) clients' contracts with CMI and third-parties, (iv) knowledge-management system, which is used to promote and showcase clients to maximize their revenue potential, and (v) potential client accounts being pursued;

b. CMI's and its affiliated companies' confidential corporate structure for Cammarata's businesses, such as KM Organic, CMI, Strategic, and Schmidt's

c. The CMI trade secrets contained on the Devices (as defined in paragraph 25 of this SACC) that CMI provided to Villar to carry out his responsibilities as Cammarata's executive assistant.

16. These KM Organic Trade Secrets and CMI Trade Secrets and other valuable computer information and data is the life blood of Cammarata's, CMI's, and KM Organic's businesses. Dissemination and use of the KM Organic Trade Secrets and CMI Trade Secrets to and by competitors would allow them to compete better with Cammarata's, CMI's, and KM Organic's business interests and significantly impact those business operations.

5

17.     Cammarata, CMI, and KM Organic take great efforts to keep the CMI Trade Secrets and KMO Trade Secrets and other valuable computer information confidential.  These precautionary measures include requiring employees, independent contractors, and other persons to sign non-disclosure and non-compete agreements, limiting employee access to materials based on a need-to-know basis, and using confidential log-in credentials to access company accounts, company electronic devices and the company's closed network.

18.     Substantially all of CMI's Trade Secrets and KM Organic's Trade Secrets are contained on Counterclaimants' company computers, electronic devices, smart phones, and network, which are used in interstate commerce or communication.

19.     CMI's Trade Secrets and KM Organic's Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable by proper means, by other persons outside of CMI and KM Organic who can obtain economic value from the disclosure, misappropriation, and/or use of such information; and are subject to efforts that are reasonable under the circumstances to maintain the secrecy of the trade secrets.

**Counterclaim Defendants and their Non-Disclosure Obligations**

20.     In or around November of 2011, Cammarata engaged Villar as an independent contractor to work as Cammarata's executive assistant.  Villar was responsible for managing the affairs of Cammarata as they related to CMI and, eventually, KM Organic and other companies in which Cammarata held interests.

21.     As Cammarata's executive assistant, a position Villar held until approximately October of 2017, Villar obtained access to the CMI Trade Secrets and KM Organic Trade Secrets and other confidential, proprietary information belonging to Cammarata, CMI, and KM Organic.

22.     To protect Cammarata's, CMI's and KM Organic's confidential, proprietary information and promote the growth and well-being of the companies, as well as that of their officers, subsidiaries, parent, partnership, affiliate and/or managed companies, on February 8, 2012, CMI and Villar entered a non-disclosure agreement (the "**Villar NDA**"), a true and correct copy of which is attached hereto as **Exhibit "A."**  In the Villar NDA, Villar acknowledged that,

6

during interactions with Cammarata and CMI, he would be "exposed to valuable and confidential proprietary information or trade secrets of CMI and CMI's clients, including without limitation, customer lists, business plans and strategies and financial information." (Ex. A, ¶ 1). Villar also acknowledged that he would be exposed to trade secrets and confidential proprietary information of certain "Managed Companies," defined in the Villar NDA to include CMI and any of its "subsidiaries or affiliates over which [Villar] shall have exercised, directly or indirectly, any supervisory, management, fiscal or operating control." (*Id.*, ¶ 7(A)). KM Organic is a Managed Company under the Villar NDA. The Villar NDA specifically states that it is to inure to the benefit of the Managed Companies, such as KM Organic, to protect their protected information, including by providing that Villar "shall not" "divulge any trade secrets or other confidential information of any of the Managed Companies." As a result, KM Organic is a third-party beneficiary of the Villar NDA entitled to enforce its provisions.

23.     Pursuant to the Villar NDA, Villar agreed to do the following:

        a.  to keep confidential all confidential proprietary information and trade secrets he obtains while providing services to CMI, including that of CMI, the Managed Companies, or of third-parties (the "**Protected Information**")[1] (*id.*, ¶¶ 1, 2, 8);

        b.  to use the Protected Information only for the purposes contemplated by CMI and as authorized by CMI in writing (*id.*, ¶¶ 1, 2);

        c.  to take all necessary precautions to protect against the disclosure of Protected Information to third-parties and to employees, agents, or contractors of CMI who do not have a need to know (*id.*, ¶ 1);

---

[1] The term Protected Information is used to refer collectively to the CMI Trade Secrets and KMO Trade Secrets, as previously defined, *and* the information protected under the Villar NDA and Smithson NDA, which is described hereinafter. The terms CMI Trade Secrets and KMO Trade Secrets are used when referring specifically to the CMI Trade Secrets and KMO Trade Secrets only.

d. to surrender, at CMI's request or upon termination of his engagement, all materials containing Protected Information, all materials furnished to Villar by CMI or the Managed Companies, and all materials prepared in connection with Villar's services for CMI and Cammarata (*id.*, ¶¶ 3, 8).

24. Further, Villar acknowledged that a breach of the Villar NDA would produce "irreparable harm" and "the remedy at law would be inadequate," such that "CMI may obtain injunctive or other equitable relief to cure, remedy or prevent such breach." (*Id.*, ¶ 4).

25. Subject to the Villar NDA and based on Villar's engagement by, and position of trust with, Cammarata, Villar obtained access to Protected Information, which related to products and services used in or intended for use in interstate or foreign commerce. Villar received at least one CMI company-issued laptop (the "Devices") and CMI paid for the service plan of a cell phone that Villar used to assist Villar in carrying out his responsibilities. The Devices were and remain the property of CMI. The material stored on the Devices and Villar's cell phone includes Protected Information, as well as other documents and communications that Villar prepared and received in performing work on behalf of Cammarata, CMI, and KM Organic. The Devices and Villar's cell phone which contained Protected Information were protected by confidential log-in credentials.

26. On May 11, 2015, CMI and Smithson entered into a non-disclosure agreement (the "**Smithson NDA**" and, collectively with the Villar NDA, the "**NDAs**") subject to the same terms as the Villar NDA, a true and correct copy of which is attached hereto as **Exhibit "B."** Pursuant to the Smithson NDA, Smithson acknowledged that, during his interactions with Cammarata and CMI, he would be "exposed to valuable and confidential proprietary information or trade secrets of CMI and CMI's clients, including without limitation, customer lists, business plans and strategies and financial information." (Ex. B, ¶ 1). Smithson also acknowledged that he would be exposed to confidential proprietary information of certain "Managed Companies," defined in the Smithson NDA to include CMI and any of its "subsidiaries or affiliates over which [Smithson] shall have exercised, directly or indirectly, any supervisory, management, fiscal or operating control." (*Id.*, ¶ 7(A)). KM Organic is a Managed Company under the Smithson NDA. The

8

Smithson NDA specifically states that it is to inure to the benefit of the Managed Companies, such as KM Organic, to protect their Protected Information, including by providing that Smithson "shall not" "divulge any trade secrets or other confidential information of any of the Managed Companies." As a result, KM Organic is a third-party beneficiary of the Smithson NDA entitled to enforce its provisions.

27.     Pursuant to the Smithson NDA, Smithson agreed to do the following:

      a.   to keep confidential all Protected Information (*id.*, ¶¶ 1, 2, 8);

      b.   to use the Protected Information only for the purposes contemplated by CMI and as authorized by CMI in writing (*id.*, ¶¶ 1, 2);

      c.   to take all necessary precautions to protect against disclosure of Protected Information to third-parties and to employees, agents, or contractors of CMI who do not have a need to know (*id.*, ¶ 1);

      d.   to surrender, at CMI's request or upon termination of his engagement, all materials containing Protected Information, all materials furnished to Smithson by CMI or the Managed Companies, and all materials prepared in connection with Smithson's services for CMI (*id.*, ¶¶ 3, 8).

28.     Further, Smithson acknowledged that a breach of the Smithson NDA would produce "irreparable harm" and "the remedy at law would be inadequate," such that "CMI may obtain injunctive or other equitable relief to cure, remedy or prevent such breach." (*Id.*, ¶ 4).

29.     Subject to the Smithson NDA and based on Smithson's position of trust with Cammarata, Smithson obtained access to Protected Information, which related to products and services used in or intended for use in interstate or foreign commerce.

30.     Villar was aware of and helped facilitate Smithson's execution of the Smithson NDA.  Villar also routinely facilitated revisions and execution of separate non-disclosure agreements that Cammarata, KM Organic and/or CMI required from third-parties to receive confidential or Protected Information. Villar's role in securing and requiring these non-disclosure agreements on behalf of CMI, KM Organic and Cammarata's other companies reinforced Villar's

9

own obligations under the Villar NDA to protect the Protected Information and other confidential business information. Villar also understood that he continued to be bound by the Villar NDA, which remained in full force and effect, and agreed that the Villar NDA applied to all continuing or additional affiliate and/or managed companies of CMI, including, but not limited to, Cammarata's work and involvement with KM Organic, Strategic and Schmidt's.

**KM Organic's Interest in Schmidt's**

31.     In 2014, while looking to invest in the growing natural and organic products industry, Cammarata met Jaime Schmidt ("**Jaime**"), who owned a business formulating and selling natural, handmade products. Based on conversations in late-2014 and early-2015, Jaime and Cammarata decided to co-found and be co-CEOs of a new company, Schmidt's, operating under the brand "Schmidt's Natural's."

32.     KM Organic is a co-owner of Schmidt's. At all times, Schmidt's has been independent of and separate from CMI, KM Organic, and Cammarata's other business ventures.

33.     Cammarata also established third-party Strategic as a vehicle for acquiring profit participations from other companies' operations.

34.     During the period that Cammarata was discussing his investment with Jaime and setting up KM Organic, Villar obtained Protected Information of Cammarata and KM Organic, including information related to Schmidt's and Strategic, through his position as Cammarata's executive assistant. Specifically, Villar learned (i) that KM Organic intended to invest in Schmidt's, (ii) the structure of KM Organic's investment in Schmidt's, (iii) the amount that KM Organic invested in Schmidt's, (iv) the valuation of Schmidt's, (v) the new ownership structure of Schmidt's following KM Organic's investment, (vi) Schmidt's targeted stores and retailers, and (vii) Schmidt's overall business model and strategy for explosive growth.

35.     Villar disclosed the Protected Information to Smithson in violation of the Villar NDA. Neither the Counterclaimants nor Cammarata knew or had reason to know of Villar's disclosures. It appears Villar disclosed the Protected Information to hoodwink Smithson into giving him a one-half interest in VMC, despite Villar making no capital investment in VMC or

10

otherwise providing value to VMC—other than the improperly obtained Protected Information. Villar appears to have copied Cammarata's confidential corporate structure and business strategies for Cammarata's business such as KM Organic, Strategic, and Schmidt's, which Villar was made privy to as Cammarata's executive assistant, to set up the corporate structure for VMC to invest in profit participations.

36. In May and July of 2015, Villar's and Smithson's jointly-owned company, VMC, entered into two term sheets with Strategic solely to acquire rights to a profit participation. Pursuant to these term sheets, VMC was entitled to a certain a percentage of ordinary business profits determined at the Schmidt's level less certain agreed upon deductions for ordinary and necessary business expenses. The term sheets did not entitle VMC, Villar, or Smithson to access Protected Information of Cammarata, CMI, KM Organic, Schmidt's or any other entities or individuals. Nor did the term sheets alter Villar's and Smithson's obligations under the NDAs.

37. After VMC invested in Strategic, Villar used his position as Cammarata's executive assistant to obtain additional Protected Information. Villar obtained access to such Protected Information, despite Cammarata's reasonable efforts to maintain its secrecy, because, as Cammarata's executive assistant, Villar received such Protected Information to save and organize for Cammarata and KM Organic. However, Villar was not authorized to use such Protected Information for any purposes other than those permitted under the Villar NDA.

38. Villar disclosed this Protected Information to Smithson and others in violation of the Villar NDA. Specifically, as early as July and August of 2015, Villar used his CMI account to send emails to Smithson that attached confidential documents and described information relating to KM Organic's business strategies, retail customer identities and product requests, potential retail customer accounts being pursued, manufacturing plans, and sensitive internal financial data of Schmidt's. Included within and attached to these emails were confidential and proprietary documents and information, including but not limited to the following:

11

a) A July 18, 2015 email from Villar to Smithson with the subject line "Fwd: SDC Distribution Qtr 2-2015.pdf." Attached to this email was a confidential Schmidt's Deodorant Company, LLC "Members Distribution Report Quarter 2 – 2015".

b) A July 18, 2015 email from Villar to Smithson with the subject line "Fwd: Cash Flow Analysis Qtr 3-2015.pdf." Attached to this email was a confidential Schmidt's Deodorant Company, LLC "Cash Flow Analysis for 3rd Quarter 2015".

c) An August 26, 2015 email from Villar to Smithson with subject line "Schmidt's Update- August 26." The body of the email contained business strategies, retail customer identities and product requests, potential retail customer accounts being pursued, manufacturing plans, and sensitive internal financial data of Schmidt's.

39.     Smithson and VMC, explicitly or implicitly took part in, encouraged, had knowledge of, and/or benefitted from Defendant Villar's disclosure and use of the Protected Information. On information and belief, Villar, Smithson, and VMC then disclosed the same Protected Information to third-parties. All of this information represented Protected Information that Villar and Smithson had agreed in their NDAs not to disclose. Neither the Counterclaimants nor Cammarata knew or had reason to know of these disclosures or uses of the Protected Information.

40.     Following KM Organic's investment, Schmidt's began to grow exponentially. By late-2016 and throughout 2017, investors, including large multi-national companies and private equity funds based in the United States and abroad, became interested in Schmidt's and made offers to acquire the company either through a stock purchase or asset purchase. These offers involved interstate commerce because, among other things, the various investors were based throughout the United States and, in many instances, were relying on financing provided by banks operating throughout the United States and abroad.

12

41. Once again, Villar obtained the Protected Information through his position as Cammarata's executive assistant, including (i) the fact that investors were interested in acquiring some or all of Schmidt's (through either stock or asset purchase), (ii) the identities of the potential investors, (iii) the terms of the potential deals, including outside valuations of Schmidt's, sale and investment amounts, ownership structures, and other negotiating positions and deal terms.

42. And once again, Villar disclosed this Protected Information to Smithson and others in violation of the Villar NDA. Smithson and VMC, explicitly or implicitly took part in, encouraged, had knowledge of, and/or benefitted from Villar's disclosure and use of KM Organic's Protected Information. On information and belief, Villar, Smithson, and VMC then disclosed the same Protected Information to third-parties in order to raise money for VMC and/or artificially raise VMC's perceived importance in the business community. All of this information represented Protected Information that Villar and Smithson had agreed in their NDAs not to disclose. Villar further understood that the Protected Information was confidential and not to be disclosed to third-parties because Villar routinely facilitated revisions and execution of separate non-disclosure agreements that Cammarata, KM Organic and/or CMI required from non-parties to receive this type of Protected Information. Villar knew he was improperly disclosing Protected Information because he hid it from Counterclaimants and Cammarata and ignored the safeguards put in place by Counterclaimants and Cammarata to protect the Protected Information. Neither the Counterclaimants nor Cammarata knew or had reason to know of these disclosures or uses of KM Organic's Protected Information.

43. In approximately October of 2017, Villar stopped providing services and his engagement with Cammarata, CMI and KM Organic terminated. Upon termination of his engagement, Villar's authorization to access the Protected Information and the Devices was immediately withdrawn pursuant to the Villar NDA, as well as company policy. Rather than directly inform Cammarata that he was discontinuing his services, Villar ignored Cammarata's communications and simply stopped providing any services to Cammarata, CMI and KM Organic. Cammarata only learned of Villar's decision to discontinue his services through conversations

13

initiated by Smithson. Although Villar's engagement terminated, he did not return the Devices or any Protected Information in his possession, as the Villar NDA, and company policy required him to do immediately upon resignation. To the contrary, Villar continued to use the Devices and Protected Information to benefit himself, Smithson, and VMC and cause harm to the Counterclaimants. Villar also accessed the CMI server without permission after his engagement ended to obtain additional Protected Information to further benefit himself, Smithson, and VMC and cause harm to the Counterclaimants. Cammarata caught Villar attempting to access CMI's server after it was discovered that Villar had secretly terminated his engagement with CMI and KM Organic and Villar's password had been changed and Villar was blocked from the server per company policy.

44. Smithson also informed Cammarata around the same time that Villar did not invest any of the funds that were ultimately used by VMC to acquire its profit participation by entering into an agreement with Strategic, but rather, Smithson allegedly funded the entire amount with the assistance of his family, who on information and belief also received Protected Information from Smithson and Villar in violation of the NDA's before entering into the agreement with VMC.

**Counterclaimants Demand Counterclaim Defendants Return Devices and Continue to Investigate Counterclaim Defendants' Use of Proprietary Information**

45. Counterclaimants first began to uncover Counterclaim Defendants' wrongful acts in December of 2017, after Villar had resigned.

46. Since then, Counterclaimants have been engaged in an ongoing investigation to verify what data Counterclaim Defendants had accessed, deleted, copied and/or transferred. Villar's refusal to return the Devices or any Protected Information in his possession, as the Villar NDA and company policy required him to do immediately upon resignation, has thwarted this process. Nevertheless, Counterclaimants' recent forensic examination of Villar's CMI email account has revealed that Villar and Smithson violated their NDAs by sending Protected

14

Information to each other, and to their own personal email accounts, without Counterclaimants' knowledge or permission.

47. Based on the results of the investigation, the evidence shows that Defendants accessed, and likely copied or otherwise removed, valuable Protected Information from Counterclaimants' computer systems, without authorization or in excess of their authorized access to those files in protected computer databases, both prior to and after Villar's resignation. Villar's and Smithson's access was "without authorization" at the point they resolved to access and disseminate the Protected Information in violation of their NDAs. Once Villar resigned, all authority to access any Protected Information or the Devices ended.

48. Villar and Smithson had no justification or authorization for accessing and/or obtaining this Protected Information for personal or competitive purposes, or for retaining, using or disclosing this data after their engagement ended. As a result of Villar's and Smithson's improper actions, upon information and belief, Smithson's family and friends, Villar's family and friends, Smithson's ex-wife, the Morgan & Morgan law firm, David Ranes or his affiliates, and other third-parties now have access to Counterclaimants' Protected Information.

49. Counterclaimants' computer server and database(s) accessed by Counterclaim Defendants clearly involved interstate communication because Counterclaimants' business interests operate in interstate commerce and rely upon computer systems connected to the internet. Indeed, the computer server and database(s) allowed employees and agents of CMI (a Delaware corporation) to work and communicate with agents of KM Organic (a Florida corporation).

50. The value of the information accessed by Counterclaim Defendants, the cost of the computer forensic investigation necessary to determine the extent of the resulting damage, and the integrity of CMI's and KM Organic's computer server and databases compromised by the actions of Counterclaim Defendants exceed $15,000. Indeed, the Protected Information regarding KM Organic's interest in Schmidt's and, later, investors' interest in acquiring assets of Schmidt's through a non-public confidential sale of assets, is worth many millions of dollars.

15

51.     VMC, through its members and agents Villar and Smithson, has used for its own benefit, valuable Protected Information obtained wrongfully from Counterclaimants.   For example, VMC used the Protected Information to make its decision to invest in Strategic, to make demands on Cammarata for monetary distributions, and to threaten (and ultimately file) litigation against Cammarata, KM Organic, and Strategic in this Court.

52.     On December 4, 2017, CMI, through counsel, sent a letter to Villar (the "Cease and Desist Letter") reminding him of his obligations under the Villar NDA and requesting that Villar cease and desist violating the NDA.  In the Cease and Desist Letter, CMI notified Villar that he was in violation of the Villar NDA because he retained the Devices after termination of his engagement and improperly disclosed the Protected Information.  CMI demanded that Villar (i) return all property belonging to CMI and all materials containing Protected Information, including the Devices, without copying or removing any information, (ii) cease and desist from using any Protected Information in violation of the NDA, (iii) provide a written list of email accounts, cloud storage accounts, and any other accounts or devices Villar used to store Protected Information, and (iv) confirm in writing by December 8, 2017 that Villar had complied with these demands.

53.     Villar never responded to the Cease and Desist Letter.  Nor did Villar comply with any of the demands in the Cease and Desist Letter to return materials, cease and desist violating the NDA, or provide a list of all accounts and devices Villar used to store the Protected Information.

54.     On August 29, 2018, CMI and Strategic, through counsel, sent a letter to counsel for Villar, Smithson, and VMC to demand, once again, that Villar, Smithson, and VMC surrender all Protected Information in their possession and all materials prepared in connection with Villar's and/or Smithson's services for Cammarata, CMI, and KM Organic.  The letter explained that Villar and Smithson continued to be bound by the NDAs, which remained in full force and effect, and demanded that Villar and Smithson cease and desist from further breaching the NDAs and, instead, begin complying with their obligations under the NDAs.

16

55.     Counterclaim Defendants did not comply with CMI's demands in the August 29, 2018 letter. Instead, VMC filed a lawsuit on October 16, 2018, in this Court (Case No.: CASE NO. 2018 CA 013104 XXXXMB (AA) (the "VMC Action"), against Cammarata, Strategic, and KM Organic, in which VMC brought nine causes of action related to the term sheets between Strategic and VMC in an attempt to re-write the terms of VMC's profit participation rights.

56.     VMC's original complaint (the "Complaint") in the VMC Action further disclosed Protected Information in violation of the NDAs, including by attaching copies of the term sheets between VMC and Strategic, alleging the amounts of profit participation distributions VMC received from Strategic, and alleging the sales price that the multinational company Unilever purportedly paid for certain Schmidt's assets even though the terms of that transaction were not publicly disclosed and are subject to a confidentiality agreement.[2]

57.     Recently, Villar through his counsel, claimed that his CMI issued laptop was destroyed. Villar otherwise maintained possession beyond his engagement with CMI of his cellular phone, on which Protected Information was stored and for which CMI paid for cellular service and data so that Villar could carry out his executive assistant duties. Villar also recently claimed that he allegedly later traded in this phone for a new one; however, discovery in this action has revealed that Villar maintains possession of the phone, or a preserved copy of the contents on the phone, which contains Protected Information. Notwithstanding Villar's representations about the CMI issued (and owned) laptop allegedly being destroyed and the phone allegedly being traded-in, Counterclaim Defendants still have access to the Protected Information they reference in the VMC Action that were stored on the laptop and cellular phone. Counterclaim Defendants have never stated what they did with the Protected Information contained on the Devices and cellular phone.

58.     In a good faith attempt to limit the instant litigation, the undersigned counsel sent a letter requesting that Counterclaim Defendants execute an affidavit under oath as follows: (1) providing a written list of email accounts, cloud storage accounts, and any other accounts or

---

[2] Cammarata is bound by a confidentiality agreement with Unilever related to the sale of certain assets of Schmidt's pursuant to an Asset Purchase Agreement with Conopco, Inc.

devices Defendants used to store Counterclaimants' Protected Information; (2) describing when the laptop was destroyed and the circumstances of its destruction; (3) confirming there were no back-ups or copies made of the CMI issued laptop before its destruction; (4) describing where the cellular phone is located and the circumstances of it being traded in for a new phone; (5) confirming there were no back-ups or copies made of the cellular phone before it being traded in and that it was forensically erased of all Protected Information; (6) confirming Counterclaim Defendants and others working on concert with Counterclaim Defendants have no other CMI electronic devices or hard drives in his possession; (7) confirming Counterclaim Defendants and third-parties working in concert with Counterclaim Defendants have not made any copies or saved any of the Protected Information; (8) confirming Counterclaim Defendants have not shared any of the Protected Information with any third-party(ies); (9) confirming Counterclaim Defendants have not shared any of the Protected Information with Villar or Smithson or their families; and (10) confirming that Counterclaim Defendants have not misappropriated the Protected Information for personal financial gain. As an alternative, if Counterclaim Defendants maintain or have disclosed or shared any of the Protected Information, the letter requested that they disclose under oath each and every instance of such disclosure and that they return all Protected Information.

59.     As of the date of the filing of this Second Amended Counterclaim, Counterclaim Defendants have refused to execute such an affidavit through counsel, necessitating the instant action.

60.     Unless Counterclaim Defendants are restrained from possessing, using and misappropriating the Protected Information, and required to return and remove all Protected Information from the VMC Action and any other public disclosures, they will continue to breach the NDAs and cause further harm to Counterclaimants.

61.     All conditions precedent to the commencement of this action and to obtain the relief sought herein have been satisfied, have been waived or otherwise excused by Counterclaim Defendants' actions.

18

62.     Counterclaimants have been required to retain the legal services of Greenberg Traurig, P.A., to pursue the remedies to which Counterclaimants are entitled, and have agreed to pay the law firm reasonable fees for its legal services.

## CAUSES OF ACTION
### COUNT I
**Permanent Injunction**
**(By CMI Against Third Party Defendants Villar and Smithson)**

63.     CMI repeats and realleges paragraphs 1 through 62 above as if fully set forth herein.

64.     This is an action against Villar and Smithson, in equity for permanent injunctive relief.

65.     Villar and Smithson agreed to be bound by the terms of the NDAs.

66.     The NDAs require that Villar and Smithson must (1) keep confidential all Protected Information; (2) use the Protected Information only for the purposes contemplated by CMI and as authorized by CMI in writing, (3) take all necessary precautions to protect against the disclosure of Protected Information to third parties and to employees, agents, or contractors of CMI who do not have a need to know; and (4) surrender, at CMI's request or upon termination of their engagement, all materials containing Protected Information, all materials furnished to Villar and/or Smithson by CMI, KM Organic, Cammarata, or the Managed Companies, and all materials prepared in connection with Villar's and/or Smithson's services for CMI or KM Organic.

67.     Defendants Villar and Smithson acknowledged in signing the NDAs that:

> Undersigned agrees that, in the event of the breach of the covenants contained in this Agreement, the harm to CMI would be irreparable and the remedy at law would be inadequate. Therefore, in addition to any other remedies sought by CMI, CMI may obtain injunctive or other equitable relief to cure, remedy or prevent such breach.

68.     Subject to the NDAs, Villar and Smithson obtained Protected Information belonging to CMI and KM Organic.

69.     This Protected Information, due to its novelty and originality, both generally and to Villar and Smithson specifically, was of tangible value.

19

70. After executing the NDAs, Villar and Smithson proceeded to use the Protected Information without CMI's or KM Organic's consent in a continuing breach of the NDAs to their benefit and to CMI's detriment. Villar and Smithson failed to maintain the confidentiality of the Protected Information by disclosing it to third parties. Villar and Smithson failed to take all necessary precautions to protect against the disclosure of Protected Information to third parties and to employees, agents, or contractors of CMI who did not have a need to know about the Protected Information. Villar and Smithson failed to surrender all materials containing Protected Information, all materials furnished to Villar and/or Smithson by CMI, KM Organic, or the Managed Companies, and all materials prepared in connection with Villar's and/or Smithson's services for CMI and KM Organic.

71. The enforcement of the restrictive covenants in the NDAs through an injunction is reasonably necessary to protect the legitimate business interests of CMI.

72. As a direct and proximate cause of the above-described conduct of Counterclaim Defendants Villar and Smithson, CMI has sustained and will continue to sustain imminent and irreparable injury (as each Counterclaim Defendant expressly acknowledged and affirmed in the NDAs) unless Counterclaim Defendants are enjoined.

73. CMI is without an adequate remedy at law to redress the harm caused by Counterclaim Defendants' actions, including the actual and threatened loss of prospective and existing customers, clients, affiliates and partnerships through the disclosure of confidential and proprietary business information, and damage to CMI's goodwill and business reputation.

74. An injunction will not threaten the public health, safety, or welfare, and the equities favor CMI to enjoin Counterclaim Defendants from continuing to breach the NDAs.

75. Wherefore, CMI demands that the Court enter judgment against Counterclaim Defendants

    a. enjoining Counterclaim Defendants from further violations of the restrictive covenants in Counterclaim Defendants' NDAs with CMI by disclosing or using the Protected Information;

20

b. enjoining Counterclaim Defendants from additional violations of the Computer Fraud and Abuse Act and misappropriation of CMI Trade Secrets;

c. requiring Counterclaim Defendants, their agents, and employees to return all information, electronic devices, and/or data obtained from CMI, including all information copied and/or retained by Counterclaim Defendants during their engagement with CMI, c/o Mark Bideau, Esq., Greenberg Traurig, P.A., 777 South Flagler Drive, Suite 300 East, West Palm Beach, FL 33401 and;

d. awarding such other and further relief as the Court deems just and proper.

## CAUSES OF ACTION
### COUNT II
### Permanent Injunction
### (By KM Organic Against Third Party Defendants Villar and Smithson)

76. KM Organic repeats and realleges paragraphs 1 through 62 above as if fully set forth herein.

77. This is an action against Villar and Smithson, in equity for permanent injunctive relief.

78. Villar and Smithson agreed to be bound by the terms of the NDAs.

79. The NDAs require that Villar and Smithson must (1) keep confidential all Protected Information; (2) use the Protected Information only for the purposes contemplated by CMI and as authorized by CMI in writing, (3) take all necessary precautions to protect against the disclosure of Protected Information to third parties and to employees, agents, or contractors of CMI who do not have a need to know; and (4) surrender, at CMI's request or upon termination of their engagement, all materials containing Protected Information, all materials furnished to Villar and/or Smithson by CMI, KM Organic, or the Managed Companies, and all materials prepared in connection with Villar's and/or Smithson's services for CMI or KM Organic.

80. KM Organic is a Managed Company under the NDAs. The NDAs specifically state that they are to inure to the benefit of the Managed Companies, such as KM Organic, to protect their Protected Information, including by providing that Villar and Smithson "shall not" "divulge

21

any trade secrets or other confidential information of any of the Managed Companies." As a result, KM Organic was intended to be and is a third-party beneficiary of the NDAs entitled to enforce their provisions.

81.     Defendants Villar and Smithson acknowledged in signing the NDAs that:

> Undersigned agrees that, in the event of the breach of the covenants contained in this Agreement, the harm to CMI would be irreparable and the remedy at law would be inadequate. Therefore, in addition to any other remedies sought by CMI, CMI may obtain injunctive or other equitable relief to cure, remedy or prevent such breach.

82.     Subject to the NDAs, Villar and Smithson obtained Protected Information belonging to CMI and KM Organic.

83.     This Protected Information, due to its novelty and originality, both generally and to Villar and Smithson specifically, was of tangible value.

84.     After executing the NDAs, Villar and Smithson proceeded to use the Protected Information without CMI's or KM Organic's consent in a continuing breach of the NDAs to their benefit and to KM Organic's detriment. Villar and Smithson failed to maintain the confidentiality of the Protected Information by disclosing it to third parties. Villar and Smithson failed to take all necessary precautions to protect against the disclosure of Protected Information to third parties and to employees, agents, or contractors of CMI who did not have a need to know about the Protected Information. Villar and Smithson failed to surrender all materials containing Protected Information, all materials furnished to Villar and/or Smithson by CMI, KM Organic, or the Managed Companies, and all materials prepared in connection with Villar's and/or Smithson's services for CMI and KM Organic.

85.     The enforcement of the restrictive covenants in the NDAs through an injunction is reasonably necessary to protect the legitimate business interests of KM Organic.

86.     As a direct and proximate cause of the above-described conduct of Counterclaim Defendants Villar and Smithson, KM Organic has sustained and will continue to sustain imminent

and irreparable injury (as each Counterclaim Defendant expressly acknowledged and affirmed in the NDAs) unless Counterclaim Defendants are enjoined.

87.     KM Organic is without an adequate remedy at law to redress the harm caused by Counterclaim Defendants' actions, including the actual and threatened loss of prospective and existing customers, clients, affiliates and partnerships through the disclosure of confidential and proprietary business information, and damage to KM Organic's goodwill and business reputation.

88.     An injunction will not threaten the public health, safety, or welfare, and the equities favor Counterclaimants to enjoin Counterclaim Defendants from continuing to breach the NDAs.

89.     Wherefore, KM Organic demands that the Court enter judgment against Counterclaim Defendants

     e.  enjoining Counterclaim Defendants from further violations of the restrictive covenants in Counterclaim Defendants' NDAs with CMI, to which KMO is a third-party beneficiary, by disclosing or using the Protected Information;

     f.  enjoining Counterclaim Defendants from additional violations of the Computer Fraud and Abuse Act and misappropriation of KM Organic Trade Secrets;

     g.  requiring Counterclaim Defendants, their agents, and employees to return all information, electronic devices, and/or data obtained from KM Organic, including all information copied and/or retained by Counterclaim Defendants during their engagement with KM Organic, c/o Mark Bideau, Esq., Greenberg Traurig, P.A., 777 South Flagler Drive, Suite 300 East, West Palm Beach, FL 33401and;

     h.  awarding such other and further relief as the Court deems just and proper.

### COUNT III
### Breach of Contract
### (By CMI Against Third Party Defendants Villar and Smithson)

90.     CMI repeats and realleges paragraphs 1 through 62 above as if fully set forth herein.

91.     Villar and Smithson agreed to be bound by the terms of the NDAs.

23

92.     The NDAs require that Villar and Smithson must (1) keep confidential all Protected Information; (2) use the Protected Information only for the purposes contemplated by CMI and as authorized by CMI in writing, (3) take all necessary precautions to protect against the disclosure of Protected Information to third parties and to employees, agents, or contractors of CMI who do not have a need to know; and (4) surrender, at CMI's request or upon termination of their engagement, all materials containing Protected Information, all materials furnished to Villar and/or Smithson by CMI, KM Organic, or the Managed Companies, and all materials prepared in connection with Villar's and/or Smithson's services for CMI.

93.     Villar and Smithson acknowledged in signing the NDAs that:

> Undersigned agrees that, in the event of the breach of the covenants contained in this Agreement, the harm to CMI would be irreparable and the remedy at law would be inadequate. Therefore, in addition to any other remedies sought by CMI, CMI may obtain injunctive or other equitable relief to cure, remedy or prevent such breach.

94.     Subject to the NDAs, Villar and Smithson obtained Protected Information belonging to CMI and KM Organic.

95.     This Protected Information, due to its novelty and originality, both generally and to Villar and Smithson specifically, was of tangible value.

96.     After executing the NDAs, Villar and Smithson proceeded to use the Protected Information without CMI's consent in a continuing breach of the NDAs to their benefit and to CMI's detriment. Villar and Smithson failed to maintain the confidentiality of the Protected Information by disclosing it to third-parties. Villar and Smithson failed to take all necessary precautions to protect against the disclosure of Protected Information to third-parties and to employees, agents, or contractors of CMI who did not have a need to know about the Protected Information. Villar and Smithson failed to surrender all materials containing Protected Information, all materials furnished to Villar and/or Smithson by CMI, KM Organic, or the Managed Companies, and all materials prepared in connection with Villar's and/or Smithson's services for CMI and KM Organic.

24

97.     CMI has been damaged, and continue to be damaged, by Villar's and Smithson's unlawful conduct.

98.     Wherefore, CMI demands that the Court enter judgment against Villar and Smithson:

        a.   awarding CMI damages due to the Villar's and Smithson's breach of the NDAs, including damages for actual losses sustained by CMI and damages for unjust enrichment caused by the breach not already taken into account in computing the actual losses; and

        b.   awarding CMI pre-judgment and post-judgment interest at the maximum lawful rate;

        c.   awarding such other and further relief as the Court deems just and proper.

## COUNT IV
### Breach of Contract
### (By KM Organic Against Third Party Defendants Villar and Smithson)

99.     Counterclaimants repeat and reallege paragraphs 1 through 62 above as if fully set forth herein.

100.    Villar and Smithson agreed to be bound by the terms of the NDAs.

101.    The NDAs require that Villar and Smithson must (1) keep confidential all Protected Information; (2) use the Protected Information only for the purposes contemplated by CMI and as authorized by CMI in writing, (3) take all necessary precautions to protect against the disclosure of Protected Information to third parties and to employees, agents, or contractors of CMI who do not have a need to know; and (4) surrender, at CMI's request or upon termination of their engagement, all materials containing Protected Information, all materials furnished to Villar and/or Smithson by CMI, KM Organic, or the Managed Companies, and all materials prepared in connection with Villar's and/or Smithson's services for CMI.

102.    KM Organic is a Managed Company under the NDAs. The NDAs specifically state that they are to inure to the benefit of the Managed Companies, such as KM Organic, to protect their Protected Information, including by providing that Villar and Smithson "shall not" "divulge

25

any trade secrets or other confidential information of any of the Managed Companies." As a result, KM Organic was intended to be and is a third-party beneficiary of the NDAs entitled to enforce their provisions.

103.　Villar and Smithson acknowledged in signing the NDAs that:

> Undersigned agrees that, in the event of the breach of the covenants contained in this Agreement, the harm to CMI would be irreparable and the remedy at law would be inadequate. Therefore, in addition to any other remedies sought by CMI, CMI may obtain injunctive or other equitable relief to cure, remedy or prevent such breach.

104.　Subject to the NDAs, Villar and Smithson obtained Protected Information belonging to CMI and KM Organic.

105.　This Protected Information, due to its novelty and originality, both generally and to Villar and Smithson specifically, was of tangible value.

106.　After executing the NDAs, Villar and Smithson proceeded to use the Protected Information without CMI's consent in a continuing breach of the NDAs to their benefit and to KMO's detriment. Villar and Smithson failed to maintain the confidentiality of the Protected Information by disclosing it to third-parties. Villar and Smithson failed to take all necessary precautions to protect against the disclosure of Protected Information to third-parties and to employees, agents, or contractors of CMI who did not have a need to know about the Protected Information. Villar and Smithson failed to surrender all materials containing Protected Information, all materials furnished to Villar and/or Smithson by CMI, KM Organic, or the Managed Companies, and all materials prepared in connection with Villar's and/or Smithson's services for CMI and KM Organic.

107.　KM Organic has been damaged, and continue to be damaged, by Villar's and Smithson's unlawful conduct.

108.　Wherefore, KM Organic demands that the Court enter judgment against Villar and Smithson:

26

d. awarding KM Organic damages due to the Villar's and Smithson's breach of the NDAs, including damages for actual losses sustained by KM Organic and damages for unjust enrichment caused by the breach not already taken into account in computing the actual losses; and

e. awarding KM Organic pre-judgment and post-judgment interest at the maximum lawful rate;

f. awarding such other and further relief as the Court deems just and proper.

**COUNT V**
**Misappropriation Under Florida's Uniform Trade Secrets Act**
**Fla. Stat., Chapter 688**
**(By CMI Against All Counterclaim Defendants)**

109.     CMI repeats and realleges paragraphs 1-13, 15-59, and 61-62 above as if fully set forth herein.

110.     Subject to the NDAs and based on their engagement by and/or positions of trust for Counterclaimants, Villar, and Smithson obtained access to CMI Trade Secrets, as defined in paragraph 15 above.

111.     All of the CMI Trade Secrets are unique to Counterclaimants and are not commonly known or available to the public.

112.     Counterclaim Defendant VMC, as alleged above, explicitly or implicitly took part in, encouraged, had knowledge of, and/or benefitted from Counterclaim Defendants Villar's and Smithson's misappropriation of the CMI Trade Secrets.

113.     The CMI Trade Secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use. CMI takes steps that are reasonable under the circumstances to maintain the secrecy of the CMI Trade Secrets.

114.     CMI's Trade Secrets constitute trade secrets that are protected by the Florida's Uniform Trade Secrets Act,§§ 688.001-688.009 (the "**FUTSA**"). The FUTSA expressly authorizes this Court to enjoin actual or threatened misappropriation of trade secret information.

27

115. Counterclaim Defendants have an affirmative duty not to misuse or otherwise misappropriate CMI's Trade Secrets where, as here, they know or have reason to know that such information is a trade secret. Counterclaim Defendants acquired CMI's Trade Secrets under circumstances giving rise to a duty to maintain their secrecy or limit their use.

116. Counterclaimants provided Villar and Smithson access to the CMI Trade Secrets pursuant to the NDAs, which permitted Villar and Smithson to use the CMI Trade Secrets subject to strict requirements. Specifically, the NDAs require that Villar and Smithson:

    a. keep confidential all confidential proprietary information and trade secrets obtained while providing services to CMI, including that of CMI, KM Organic, the Managed Companies, or of third-parties, (*See* Exs. A & B, ¶¶ 1, 2, 8);

    b. use confidential proprietary information and trade secrets only for the purposes contemplated by CMI and as authorized by CMI in writing, (*id.*, ¶¶ 1, 2);

    c. take all necessary precautions to protect against disclosure of confidential proprietary information and trade secrets to third parties and to employees, agents, or contractors of CMI who do not have a need to know (*id.*, ¶ 1);

    d. surrender, at CMI's request or upon termination of the engagement, all materials containing confidential proprietary information and trade secrets, all materials furnished to Villar and/or Smithson by CMI, KM Organic, or the Managed Companies, and all materials prepared in connection with Villar's and/or Smithson's services for CMI or KM Organic, (*id.*, ¶¶ 3, 8).

117. Counterclaim Defendants knew that Villar and Smithson were subject to a duty to maintain the secrecy of and limit the use of the CMI Trade Secrets.

118. Counterclaim Defendants did not have Counterclaimants' consent, express or implied, to appropriate or disclose CMI's Trade Secrets for their own use or benefit or for the use or benefit of any other person or entity.

119. Counterclaim Defendants have misappropriated the CMI Trade Secrets by acquiring them through the improper means of misleading Counterclaimants about their intention

28

to provide services to Counterclaimants as independent contractors in order to induce Counterclaimants to disclose the CMI Trade Secrets, when Counterclaim Defendants in fact intended to use the CMI Trade Secrets to serve their own interests and to the detriment of CMI.

120.    Counterclaim Defendants have further misappropriated the CMI Trade Secrets by disclosing and using them without Counterclaimants' consent when they used improper means to obtain them and knew that, pursuant to the NDAs and the parties' relationship, the Counterclaim Defendants had a duty to maintain the secrecy of the CMI Trade Secrets and limit their use only to actions in furtherance of their commercial relationship with Counterclaimants.

121.    The Counterclaim Defendants' acts of misappropriation have caused irreparable injury to CMI and will continue to cause irreparable injury to CMI if the Counterclaim Defendants are not restrained by this Court from further violating CMI's trade secret rights.

122.    The use or disclosure of threatened use or disclosure of CMI's Trade Secrets by Counterclaim Defendants entitles CMI to relief under FUTSA.

123.    At all material times, Counterclaim Defendants have acted willfully and maliciously.

124.    The acts and threatened acts of misappropriation or misuse by Counterclaim Defendants have caused and will continue to cause substantial damage to CMI.

125.    Disclosure or use of CMI's Trade Secrets will result in immediate and irreparable harm to CMI for which there is no adequate remedy at law, as Villar and Smithson acknowledged in signing the NDAs.

126.    As a result of the above-described willful and malicious misappropriation of CMI's Trade Secrets, CMI is entitled to an injunction and an award of damages, costs of this action, and attorneys' fees, all as set forth in the FUTSA, subject to the discretion of this Court.

127.    Wherefore, CMI demands that the Court enter judgment against Counterclaim Defendants:

> a. enjoining Counterclaim Defendants as set forth in Fla. Stat. § 688.003 from using or disclosing CMI's Trade Secrets or engaging in any business practices

29

which arose from their misappropriation of the CMI Trade Secrets and requiring affirmative actions be taken by the Counterclaim Defendants to protect the CMI Trade Secrets;

b. requiring Counterclaim Defendants, their agents, and employees to return all CMI Trade Secrets retained by Counterclaim Defendants during their engagement with CMI, c/o Mark Bideau, Esq., Greenberg Traurig, P.A., 777 South Flagler Drive, Suite 300 East, West Palm Beach, FL 33401;

c. requiring Counterclaim Defendants Villar and Smithson to deliver their personal and home computers and personal devices, such as handheld personal assistants, smart phones, media devices and storage drives to CMI, c/o Mark Bideau, Esq., Greenberg Traurig, P.A., 777 South Flagler Drive, Suite 300 East, West Palm Beach, FL 33401, for forensic imaging on or before a date certain;

d. restraining Counterclaim Defendants, their agents, and employees from destroying (or causing to be destroyed) any and all information and documents which are potentially relevant to CMI's claims;

e. awarding CMI damages, as set forth in 18 U.S.C. § 1836, due to the Counterclaim Defendants' misappropriation of CMI's Trade Secrets, including damages for actual losses sustained by CMI and damages for unjust enrichment caused by the misappropriation not already taken into account in computing the actual losses; or damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the Counterclaim Defendants' unauthorized disclosure and use of the CMI Trade Secrets;

f. awarding CMI's increased damages in an amount not more than two times the amount of the damages award due to the Counterclaim Defendants' willful and malicious misappropriation, as provided in 18 U.S.C. § 1836(b)(3);

g. awarding CMI pre-judgment and post-judgment interest at the maximum lawful rate;

30

h. awarding CMI's attorneys' fees and costs; and

i. awarding such other and further relief as the Court deems just and proper.

**COUNT VI**
**Misappropriation Under Florida's Uniform Trade Secrets Act**
**Fla. Stat., Chapter 688**
**(By KM Organic Against All Counterclaim Defendants)**

128. KM Organic repeats and realleges paragraphs 1-14, 16-59, and 61-62 above as if fully set forth herein.

129. Subject to the NDAs, of which KM Organic is a third-party beneficiary as a Managed Company expressly protected by the NDAs, and based on their engagement by and/or positions of trust for KM Organic, Villar, and Smithson obtained access to the KM Organic Trade Secrets, as defined in paragraph 14 above.

130. All of the KM Organic Trade Secrets are unique to KM Organic and are not commonly known or available to the public.

131. Counterclaim Defendant VMC, as alleged above, explicitly or implicitly took part in, encouraged, had knowledge of, and/or benefitted from Counterclaim Defendants Villar's and Smithson's misappropriation of the KM Organic Trade Secrets.

132. The KM Organic Trade Secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use. KM Organic takes steps that are reasonable under the circumstances to maintain the secrecy of the KM Organic Trade Secrets.

133. KM Organic's Trade Secrets constitute trade secrets that are protected by the Florida's Uniform Trade Secrets Act, §§ 688.001-688.009 (the "**FUTSA**"). The FUTSA expressly authorizes this Court to enjoin actual or threatened misappropriation of trade secret information.

134. Counterclaim Defendants have an affirmative duty not to misuse or otherwise misappropriate KM Organic's Trade Secrets where, as here, they know or have reason to know

31

that such information is a trade secret. Counterclaim Defendants acquired KM Organic's Trade Secrets under circumstances giving rise to a duty to maintain their secrecy or limit their use.

135.    Counterclaimants provided Villar and Smithson access to the KM Organic Trade Secrets pursuant to the NDAs, which permitted Villar and Smithson to use the KM Organic Trade Secrets subject to strict requirements. Specifically, the NDAs require that Villar and Smithson:

    a.  keep confidential all confidential proprietary information and trade secrets obtained while providing services to CMI, including that of CMI, KM Organic, the Managed Companies, or of third-parties, (*See* Exs. A & B, ¶¶ 1, 2, 8);

    b.  use confidential proprietary information and trade secrets only for the purposes contemplated by CMI and as authorized by CMI in writing, (*id.*, ¶¶ 1, 2);

    c.  take all necessary precautions to protect against disclosure of confidential proprietary information and trade secrets to third parties and to employees, agents, or contractors of CMI who do not have a need to know (*id.*, ¶ 1);

    d.  surrender, at CMI's request or upon termination of the engagement, all materials containing confidential proprietary information and trade secrets, all materials furnished to Villar and/or Smithson by CMI, KM Organic, or the Managed Companies, and all materials prepared in connection with Villar's and/or Smithson's services for CMI or KM Organic, (*id.*, ¶¶ 3, 8).

136.    Counterclaim Defendants knew that Villar and Smithson were subject to a duty to maintain the secrecy of and limit the use of the KM Organic Trade Secrets.

137.    Counterclaim Defendants did not have Counterclaimants' consent, express or implied, to appropriate or disclose KM Organic's Trade Secrets for their own use or benefit or for the use or benefit of any other person or entity.

138.    Counterclaim Defendants have misappropriated the KM Organic Trade Secrets by acquiring them through the improper means of misleading Counterclaimants about their intention to provide services to Counterclaimants as independent contractors in order to induce Counterclaimants to disclose the KM Organic Trade Secrets, when Counterclaim Defendants in

32

fact intended to use the KM Organic Trade Secrets to serve their own interests to the detriment of KM Organic.

139.    Counterclaim Defendants have further misappropriated the KM Organic's Trade Secrets by disclosing and using them without Counterclaimants' consent when they used improper means to obtain them and knew that, pursuant to the NDAs and the parties' relationship, the Counterclaim Defendants had a duty to maintain the secrecy of the KM Organic Trade Secrets and limit their use only to actions in furtherance of their commercial relationship with Counterclaimants.

140.    The Counterclaim Defendants' acts of misappropriation have caused irreparable injury to KM Organic and will continue to cause irreparable injury to KM Organic if the Counterclaim Defendants are not restrained by this Court from further violating KM Organic's' trade secret rights.

141.    The use or disclosure of threatened use or disclosure of KM Organic's Trade Secrets by Counterclaim Defendants entitles KM Organic to relief under FUTSA.

142.    At all material times, Counterclaim Defendants have acted willfully and maliciously.

143.    The acts and threatened acts of misappropriation or misuse by Counterclaim Defendants have caused and will continue to cause substantial damage to KM Organic.

144.    Disclosure or use of KM Organic's Trade Secrets will result in immediate and irreparable harm to KM Organic for which there is no adequate remedy at law, as Villar and Smithson acknowledged in signing the NDAs.

145.    As a result of the above-described willful and malicious misappropriation of KM Organic's Trade Secrets, KM Organic is entitled to an injunction and an award of damages, costs of this action, and attorneys' fees, all as set forth in the FUTSA, subject to the discretion of this Court.

146.    Wherefore, KM Organic demands that the Court enter judgment against Counterclaim Defendants:

a. enjoining Counterclaim Defendants as set forth in Fla. Stat. § 688.003 from using or disclosing KM Organic's Trade Secrets or engaging in any business practices which arose from their misappropriation of the KM Organic Trade Secrets and requiring affirmative actions be taken by the Counterclaim Defendants to protect the KM Organic Trade Secrets;

b. requiring Counterclaim Defendants, their agents, and employees to return all KM Organic Trade Secrets copied and/or retained by Counterclaim Defendants during their engagement with KM Organic, c/o Mark Bideau, Esq., Greenberg Traurig, P.A., 777 South Flagler Drive, Suite 300 East, West Palm Beach, FL 33401;

c. requiring Counterclaim Defendants Villar and Smithson to deliver their personal and home computers and personal devices, such as handheld personal assistants, smart phones, media devices and storage drives to KM Organic, c/o Mark Bideau, Esq., Greenberg Traurig, P.A., 777 South Flagler Drive, Suite 300 East, West Palm Beach, FL 33401, for forensic imaging on or before a date certain;

d. restraining Counterclaim Defendants, their agents, and employees from destroying (or causing to be destroyed) any and all information and documents which are potentially relevant to KM Organic's claims;

e. awarding KM Organic damages, as set forth in 18 U.S.C. § 1836, due to the Counterclaim Defendants' misappropriation of KM Organic's Trade Secrets, including damages for actual losses sustained by KM Organic and damages for unjust enrichment caused by the misappropriation not already taken into account in computing the actual losses; or damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the Counterclaim Defendants' unauthorized disclosure and use of the KM Organic Trade Secrets;

34

f. awarding KM Organic increased damages in an amount not more than two times the amount of the damages award due to the Counterclaim Defendants' willful and malicious misappropriation, as provided in 18 U.S.C. § 1836(b)(3);

g. awarding KM Organic pre-judgment and post-judgment interest at the maximum lawful rate;

h. awarding KM Organic's attorneys' fees and costs; and

i. awarding such other and further relief as the Court deems just and proper.

### COUNT VII
### Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030
### (Against All Counterclaim Defendants)

147. Counterclaimants repeat and reallege paragraphs 1 through 62 above as if fully set forth herein.

148. Counterclaim Defendants Villar and Smithson, knowingly and/or with intent to defraud Counterclaimants, accessed Counterclaimants' computer system(s) and server without authorization and/or exceeded authorized use to obtain information from a computer used in interstate commerce, in violation of the CFAA, 18 U.S.C. § 1030(a)(2)(C).

149. Counterclaim Defendant Villar exceeded authorized use to obtain information from Counterclaimants' protected computer system(s) by violating Counterclaimants' policy during Villar's engagement that limited Villar's authorized access to protected computers. Counterclaimants enforced this policy, in part, by requiring Counterclaim Defendants Villar and Smithson to sign NDAs that limited their authorized access. Specifically, the NDAs include the following terms:

a. "[U]ndersigned will be exposed to valuable and confidential proprietary information or trade secrets of CMI and CMI's clients . . . . Undersigned agrees with CMI to hold all such information in trust and confidence and agrees that it shall be used only for the contemplated purposes, shall not be used for any other purpose, or disclosed to any third party." (Ex. A, ¶ 1; Ex. B, ¶ 1).

35

b. "Undersigned shall use CMI's confidential or proprietary information only to the extent necessary as authorized by CMI in writing and will not use or disclose such information without the prior written authorization of CMI." (Ex. A, ¶ 2; Ex. B, ¶ 2).

c. "Undersigned shall return all materials furnished to Undersigned by CMI, and all materials prepared by Undersigned in connection with Undersigned's review, evaluation, and/or assessment of CMI's confidential information . . . promptly upon request by CMI." (Ex. A, ¶ 3; Ex. B, ¶ 3).

d. "The Undersigned shall not, at any time during the Engagement Period or thereafter, make use of any bidding information (or computer programs thereof) of any of the Managed Companies, nor divulge any trade secrets or other confidential information of any of the Managed Companies, except to the extent that such information becomes a matter of public record." (Ex. A, ¶ 8; Ex. B, ¶ 8).

150. Villar violated Counterclaimants' policy, and exceeded his authorized access, by accessing and then emailing Protected Information to Smithson and others in violation of the Villar NDA and contrary to Counterclaimants' best interests and corporate policies. Specifically, as early as July and August of 2015, Villar used his CMI account to send emails to Smithson that attached confidential documents and described information relating to KM Organic's business strategies, retail customer identities and product requests, potential retail customer accounts being pursued, manufacturing plans, and sensitive internal financial data of Schmidt's. Included within and attached to these emails were confidential and proprietary documents and information, including but not limited to the following:

a. A July 18, 2015 email from Villar to Smithson with the subject line "Fwd: SDC Distribution Qtr 2-2015.pdf." Attached to this email was a

36

confidential Schmidt's Deodorant Company, LLC "Members Distribution Report Quarter 2 – 2015".

b. A July 18, 2015 email from Villar to Smithson with the subject line "Fwd: Cash Flow Analysis Qtr 3-2015.pdf." Attached to this email was a confidential Schmidt's Deodorant Company, LLC "Cash Flow Analysis for 3rd Quarter 2015".

c. An August 26, 2015 email from Villar to Smithson with subject line "Schmidt's Update- August 26." The body of the email contained business strategies, retail customer identities and product requests, potential retail customer accounts being pursued, manufacturing plans, and sensitive internal financial data of Schmidt's.

151.    Smithson and VMC, explicitly or implicitly agreed to, directed, took part in, encouraged, had knowledge of, and/or benefitted from Defendant Villar's unauthorized access, disclosure, and use of the Protected Information in violation of Counterclaimants' interests and corporate policy. On information and belief, Villar, Smithson, and VMC then disclosed the same Protected Information to third-parties. All of this information represented Protected Information that Villar and Smithson had agreed in their NDAs not to disclose.

152.    Counterclaim Defendant Villar also violated the CFAA because he accessed and/or destroyed Counterclaimants' protected computer system(s) without authority by failing to return the Devices and Protected Information, and by admittedly destroying the Devices and Protected Information in his possession, after Villar's engagement ended, in violation of Counterclaimants' policy during Villar's engagement and contrary to Counterclaimants' interests. Specifically, the Villar NDA includes the following terms concerning Counterclaimants' corporate policy:

a. "Undersigned shall return all materials furnished to Undersigned by CMI, and all materials prepared by Undersigned in connection with Undersigned's review, evaluation, and/or assessment of CMI's confidential information . . . promptly upon request by CMI." (Ex. A, ¶ 3).

37

b. "[W]hen the Undersigned shall cease to be engaged by CMI, the Undersigned shall surrender to CMI all records and other documents obtained by him or entrusted to him during the course of his engagement (together with all copies thereof) which pertain specifically to any of the business covered by the covenants in Section 7 or which were paid for by any of the Managed Companies." (Ex. A, ¶ 8).

153.    Counterclaim Defendants VMC and Smithson, as alleged above,  explicitly or implicitly agreed to, directed, took part in, encouraged, had knowledge of, and/or benefitted from Defendant Villar's unauthorized access and/or destruction of Counterclaimants' protected computer system(s) by failing to return the Devices and Protected Information, and by admittedly destroying the Devices and Protected Information in his possession, after Villar's engagement ended, in violation of Counterclaimants' policy during Villar's engagement and contrary to Counterclaimants' interests. On information and belief, Villar, Smithson, and VMC then disclosed the same Protected Information to third-parties.  All of this information represented Protected Information that Villar and Smithson had agreed in their NDAs not to disclose.

154.    Smithson and VMC are also liable to Counterclaimants under the conspiracy provisions of the CFAA contained in 18 U.S.C. § 1030(b), which creates an independent CFAA violation for conspiring to commit the offenses alleged above and provided in 18 U.S.C. § 1030(a)(1)-(7). On information and belief, Smithson and VMC entered into an agreement with Villar to violate the law by exceeding Villar's authorized access to Counterclaimants' protected computer systems by accessing and destroying Counterclaimants' protected computer systems and by emailing Protected Information to Smithson, VMC, and others in violation of the NDAs, contrary to Counterclaimants' best interests and corporate policies, and to benefit themselves and damage Counterclaimants. On information and belief, Counterclaim Defendants also had an agreement among themselves to accomplish the conspiracy, such that Villar and Smithson agreed to undertake the conspiracy and Smithson, acting on behalf of VMC, caused VMC to agree with Villar on the conspiracy. On information and belief, Counterclaimants' object in pursuing the

38

conspiracy was to use the information stolen from Counterclaimants to organize VMC, procure the Term Sheets, and demand payment in excess of their rights under the Term Sheets. Since Villar conducted and performed these wrongful acts at the behest of and on behalf of Smithson and VMC, both Smithson and VMC are liable for Villar's actions as alleged herein under both a vicarious liability theory and under the conspiracy section of the CFAA.

155. By reason of the above-alleged acts and conduct, Counterclaim Defendants furthered their intended wrongdoing by improperly obtaining and utilizing Protected Information from Counterclaimants' computer system(s) and server.

156. Counterclaim Defendants' acts and conduct have impaired the integrity and availability of Counterclaimants' data, programs, systems and/or information.

157. By reason of the above-alleged acts and conduct by Counterclaim Defendants, Counterclaimants have been damaged, and will suffer great and irreparable harm and damage far in excess of $15,000. Counterclaimants' damages will include their continued diagnostic examination of Counterclaimants' computer system to ascertain the full extent of compromised and impaired information, as well as losses for responding to the above-alleged acts and conduct by Counterclaimants, conducting a damage and lost revenue assessment, and other consequential damages incurred because of the impairment of Counterclaimants' data, programs, systems, and/or information.

158. Counterclaimants lack an adequate remedy at law and, unless enjoined by this Court, Counterclaim Defendants will continue to cause irreparable injury and damage Counterclaimants as a result of the wrongful acts complained of herein.

159. In addition to the damages Counterclaimants have suffered, Counterclaim Defendants' accessing and ongoing possession of Counterclaimants' valuable business information, including its Protected Information, obtained in violation of the CFAA, and use and disclosure of such information, poses a real, present and significant threat of unauthorized disclosure and use of this information.

160. By reason of Counterclaim Defendants' acts and conduct, Counterclaimants are suffering and will continue to suffer immediate and irreparable harm.

161. Wherefore, Counterclaimants demand that the Court enter judgment against Counterclaim Defendants:

a. enjoining Counterclaim Defendants as set forth in 18 U.S.C. § 1030(g) from using or disclosing information and/or data obtained from through unauthorized access to Counterclaimants' computer system(s) and server in violation of the CFAA;

b. requiring, Counterclaim Defendants, their agents, and employees to return information and/or data obtained from Counterclaimants through unauthorized access to Counterclaimants' computer system(s) and server, and other of Counterclaimants' property to Counterclaimants, including any information copied and/or retained by Defendants during their engagement with CMI to Counterclaimants, c/o Mark Bideau, Esq., Greenberg Traurig, P.A., 777 South Flagler Drive, Suite 300 East, West Palm Beach, FL 33401;

c. requiring Counterclaim Defendants Villar and Smithson to deliver their personal and home computers and personal devices, such as handheld personal assistants, smart phones, media devices and storage drives to Counterclaimants, c/o Mark Bideau, Esq., Greenberg Traurig, P.A., 777 South Flagler Drive, Suite 300 East, West Palm Beach, FL 33401, for forensic image on or before a date certain;

d. restraining Counterclaim Defendants, their agents, and employees from destroying (or causing to be destroyed) any and all information and documents which are potentially relevant to Counterclaimants' claims;

e. awarding Counterclaimants damages as set forth in 18 U.S.C. § 1030(g); and

f. awarding such other and further relief as the Court deems just and proper.

40

## COUNT VIII
### Conversion
#### (By CMI Against Third Party Defendant Villar)

162.     Counterclaim Defendant Villar intentionally retained the Devices (defined in paragraph 25 above), which were the property of CMI, after Villar resigned from his engagement as Cammarata's executive assistant.

163.     Counterclaim Defendant Villar also intentionally accessed and removed data from the Devices.

164.     Counterclaim Defendants Smithson and VMC, as alleged above, explicitly or implicitly took part in, encouraged, had knowledge of, and/or benefited from his intentional removal of data from the Devices.

165.     Counterclaimants' have demanded that Villar return the Protected Information and Devices that Villar removed from CMI.

166.     Villar has failed to return CMI's property.

167.     Villar's refusal to return CMI's property in Villar's possession is an exercise of wrongful dominion and control over CMI's property and is detrimental to CMI's rights as the owners of said property.

168.     Villar took these actions knowingly and with the intent to permanently deprive CMI of its property, and appropriate it to his own use or the use and benefit of others not entitled to it.

169.     As a direct and proximate result of Villar's conversion, CMI has suffered damages in an amount to be determined at trial.

170.     Based on the foregoing, CMI reserves the right to seek punitive damages for this Count, pursuant to Fla. Stat. § 768.72.

171.     Wherefore, Counterclaimants demand that the Court enter judgment against Villar:

    a.   awarding CMI damages in an amount to be fixed at trial, together with interest;

    b.   awarding CMI its costs incurred in connection with this action; and

    c.   awarding CMI such other and further relief as the Court deems just and proper.

41

Wherefore, Counterclaimants demand judgment against Counterclaim Defendants, Christopher Villar, aka Christopher Villan, William Kyle Smithson, and Virtual Mountain Capital, LLC for permanent injunctive relief and damages, together with interest, attorneys' fees and costs, and such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Counterclaimants demand a jury trial as to all issues so triable.

Dated: May 4, 2020                                Respectfully Submitted,

**GREENBERG TRAURIG, P.A.**
777 South Flagler Drive, Suite 300 East
West Palm Beach, Florida 33401
Telephone: (561) 650-7900
Facsimile: (561) 655-6222

By: */s/ Robert R. Kane III*
MARK F. BIDEAU, ESQ.
Fla. Bar No. 564044
bideaum@gtlaw.com
thomasd@gtlaw.com
FLService@gtlaw.com
ROBERT R. KANE III, ESQ.
Fla. Bar No. 99488
kaner@gtlaw.com
chalkleyt@gtlaw.com
*Attorneys for*
*Counterclaimants/Defendants*

42

# EXHIBIT A

## NON-DISCLOSURE AGREEMENT

In consideration of $10 and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned (hereinafter "Undersigned"), hereby covenants and agrees as follows:

1. Undersigned acknowledges that in the course of his or her meetings, discussions and negotiations at or with Cammarata Management, Inc. ("CMI"), Undersigned will be exposed to valuable and confidential proprietary information or trade secrets of CMI and CMI's clients, including without limitation, customer lists, business plans and strategies and financial information. Undersigned agrees with CMI to hold all such information in trust and confidence and agrees that it shall be used only for the contemplated purposes, shall not be used for any other purpose, or disclosed to any third party. Undersigned shall take all necessary precautions against disclosure of such information to third parties and to employees, agents, or contractors of CMI who do not have a need to know.

2. Undersigned shall use CMI's confidential or proprietary information only to the extent necessary as authorized by CMI in writing and will not use or disclose such information without the prior written authorization of CMI.

3. Undersigned shall return all materials furnished to Undersigned by CMI, and all materials prepared by Undersigned in connection with Undersigned's review, evaluation and/or assessment of CMI's confidential information, including memoranda, notes, plans, records, reports and other documents (and copies thereof) relating to the business of CMI, promptly upon request by CMI.

4. Undersigned agrees that, in the event of the breach of the covenants contained in this Agreement, the harm to CMI would be irreparable and the remedy at law would be inadequate. Therefore, in addition to any other remedies sought by CMI, CMI may obtain injunctive or other equitable relief to cure, remedy or prevent such breach. Nothing contained in this Agreement shall require or be construed as to require the commission of any act contrary to any law, rule or regulation of any governmental authority, and if there shall exist any conflict between any provision of this Agreement and any such law, rule or regulation, the latter shall prevail and the pertinent provision or provisions of this Agreement shall be curtailed, limited or eliminated to the extent necessary to remove such conflict, and to so modified, this Agreement shall continue in full force and effect.

5. Undersigned understands that he or she has no contractual rights in any employment with CMI.

6. No waiver by any party of any breach or default hereunder shall be deemed to be a waiver of any preceding or subsequent breach or default. All waivers must be in writing, specify the breach or default concerned and be signed by the party against whom the waiver is sought to be enforced. The payment of any monies by any party shall not be deemed a waiver. This Agreement and the rights and obligations of the parties hereunder shall inure to the benefit of and be binding upon the permitted assigns, successors and affiliated entities of the parties hereto.

7. In the event and to the extent that Undersigned is engaged by CMI to perform services or provide work, during such engagement period (the "Engagement Period") and for a period of one year thereafter, except with the prior written consent of CMI, Undersigned:

(A) shall not engage in any activities whether as employer, proprietor, partner, stockholder (other than the holder of less than 5% of the stock of a corporation the securities of which are traded on a national securities exchange or in the over-the-counter market), director, officer, employee or otherwise, in competition with (I) the businesses conducted at the date hereof by the CMI or any of its subsidiaries or affiliates over which he shall have exercised, directly or indirectly, any supervisory, management, fiscal or operating control during the Engagement Period (the "Managed Companies"), or (2) any business in which the Managed Companies are substantially engaged at any time during the Engagement Period;

(B) shall not solicit, in competition with the Managed Companies, any person who is a customer of the businesses conducted by the Managed Companies at the date hereof or of any business in which the Managed Companies are substantially engaged at any time during the Engagement Period; and

(C) shall not induce or attempt to persuade any employee of or independent contractor for the Managed Companies to terminate his employment relationship in order to enter into competitive employment.

8. The Undersigned shall not, at any time during the Engagement Period or thereafter, make use of any bidding information (or computer programs thereof) of any of the Managed Companies, nor divulge any trade secrets or other confidential information of any of the Managed Companies, except to the extent that such information becomes a matter of public record, is published in a newspaper, magazine or other periodical available to the general public or as CMI may so authorize in writing and when the Undersigned shall cease to be engaged by CMI, the Undersigned shall surrender to CMI all records and other documents obtained by him or entrusted to him during the course of his engagement (together with all copies thereof) which pertain specifically to any of the businesses covered by the covenants in Section 7 or which were paid for by any of the Managed Companies; provided, however, that the Undersigned may retain copies of such documents as necessary for the Undersigned's personal records for federal income tax purposes.

9. The following provisions shall apply to the covenants of the Undersigned contained in Sections 7 and 8:

(A) the covenants contained in paragraphs (A) and (B) of Section 7 shall apply within all territories in which any of the Managed Companies are actively engaged in the conduct of business during the Engagement Period, including, without limitation, the territories in which customers are then being solicited;

*C.V.*

Case 3:20-cv-01016   Document 1-1   Filed 11/23/20   Page 47 of 51 PageID #: 62

(ii) without limiting the right of CMI to pursue all other legal and equitable remedies available for violation by the Undersigned of the covenants contained in Sections 7 and 8, it is expressly agreed by the Undersigned and CMI that such other remedies cannot fully compensate CMI for any such violation and that CMI shall be entitled to injunctive relief to prevent any such violation or any continuing violation thereof;

(C) each party intends and agrees that if in any action before any court or agency legally empowered to enforce the covenants contained in Sections 7 and 8 any term, restriction, covenant or promise contained therein is found to be unreasonable and accordingly unenforceable, then such term, restriction, covenant or promise shall be deemed modified to the extent necessary to make it enforceable by such court or agency; and

(D) the covenants contained in Sections 7 and 8 shall survive the conclusion of the Undersigned's engagement by CMI.

10.  Undersigned irrevocably submits to the jurisdiction of the United States District Court, Southern District of Florida ("Florida Federal Court") over any action or proceeding arising out of or relating to this Agreement and hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined only in such Florida Federal Court. Alternatively, if the Florida Federal Court shall not have jurisdiction over the subject matter of the action or proceeding, then the action or proceeding may be brought in any State Court of Florida in Palm Beach County having jurisdiction over the subject matter ("Florida State Court"), and Undersigned hereby irrevocably submits to the jurisdiction of the Florida State Court. As an alternative method of personal service, Undersigned irrevocably consents to the service of any and all process in any such action or proceeding by the mailing of copies of the address set forth below. Undersigned agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment, or in any manner provided by law. Undersigned further waives any objection to venue in such Florida Federal Court or Florida State Court and any objection to any action or proceeding in such Florida Federal Court or Florida State Court on the basis of forum non conveniens. Undersigned further agrees that any such action or proceeding brought hereunder shall be brought only in a Florida Federal Court or Florida State Court. Nothing in this paragraph shall affect the right of CMI to serve legal process in any other manner permitted by law. This Agreement shall be governed, construed and enforced in accordance with the substantive law of contracts of the State of Florida and without regard to Florida choice of law principles or conflicts of law principles.

11.  UNDERSIGNED ACKNOWLEDGES AND AGREES THAT CMI INTENDS AND SHALL HAVE THE RIGHT TO VIGOROUSLY PURSUE ALL ITS RIGHTS AND REMEDIES, BOTH CIVIL AS WELL AS CRIMINAL, AT LAW OR IN EQUITY, IN THE EVENT OF A BREACH OR THREATENED BREACH OF THIS AGREEMENT BY THE UNDERSIGNED.

I have read the above. I understand its terms and agree they are reasonable. I agreed to be bound by them.

Dated:  FEB 8, 2012

Undersigned's Signature

CHRISTOPHER VILLAR
Undersigned's Name (Print)

Address:  23823 VIA ALISOL
MURRIETA CA. 92562

# EXHIBIT B

## NON-DISCLOSURE AGREEMENT

In consideration of $10 and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned (hereinafter "Undersigned"), hereby covenants and agrees as follows:

1.      Undersigned acknowledges that, in the course of his or her meetings, discussions and negotiations at or with Cammarata Management, Inc. ("CMI"), Undersigned will be exposed to valuable and confidential proprietary information or trade secrets of CMI and CMI's clients, including without limitation, customer lists, business plans and strategies and financial information. Undersigned agrees with CMI to hold all such information in trust and confidence and agrees that it shall be used only for the contemplated purposes, shall not be used for any other purpose, or disclosed to any third party. Undersigned shall take all necessary precautions against disclosure of such information to third parties and to employees, agents, or contractors of CMI who do not have a need to know.

2.      Undersigned shall use CMI's confidential or proprietary information only to the extent necessary as authorized by CMI in writing and will not use or disclose such information without the prior written authorization of CMI.

3.      Undersigned shall return all materials furnished to Undersigned by CMI, and all materials prepared by Undersigned in connection with Undersigned's review, evaluation and/or assessment of CMI's confidential information, including memoranda, notes, plans, records, reports and other documents (and copies thereof) relating to the business of CMI, promptly upon request by CMI.

4.      Undersigned agrees that, in the event of the breach of the covenants contained in this Agreement, the harm to CMI would be irreparable and the remedy at law would be inadequate. Therefore, in addition to any other remedies sought by CMI, CMI may obtain injunctive or other equitable relief to cure, remedy or prevent such breach. Nothing contained in this Agreement shall require or be construed as to require the commission of any act contrary to any law, rule or regulation of any governmental authority, and if there shall exist any conflict between any provision of this Agreement and any such law, rule or regulation, the latter shall prevail and the pertinent provision or provisions of this Agreement shall be curtailed, limited or eliminated to the extent necessary to remove such conflict, and as so modified, this Agreement shall continue in full force and effect.

5.      Undersigned understands that he or she has no contractual rights to any employment with CMI.

6.      No waiver by any party of any breach or default hereunder shall be deemed to be a waiver of any preceding or subsequent breach or default. All waivers must be in writing, specify the breach or default concerned and be signed by the party against whom the waiver is sought to be enforced. The payment of any monies by any party shall not be deemed a waiver. This Agreement and the rights and obligations of the parties hereunder shall inure to the benefit of and be binding upon the permitted assigns, successors and affiliated entities of the parties hereto.

7.      In the event and to the extent that Undersigned is engaged by CMI to perform services or provide work, during such engagement period (the "Engagement Period") and for a period of one year thereafter, except with the prior written consent of CMI, Undersigned:

         (A) shall not engage in any activities whether as employer, proprietor, partner, stockholder (other than the holder of less than 5% of the stock of a corporation the securities of which are traded on a national securities exchange or in the over-the- counter market), director, officer, employee or otherwise, in competition with (1) the businesses conducted at the date hereof by the CMI or any of its subsidiaries or affiliates over which he shall have exercised, directly or indirectly, any supervisory, management, fiscal or operating control during the Engagement Period (the "Managed Companies"), or (2) any business in which the Managed Companies are substantially engaged at any time during the Engagement Period;

         (B) shall not solicit, in competition with the Managed Companies, any person who is a customer of the businesses conducted by the Managed Companies at the date hereof or of any business in which the Managed Companies are substantially engaged at any time during the Engagement Period; and

         (C) shall not induce or attempt to persuade any employee of or independent contractor for the Managed Companies to terminate his employment relationship in order to enter into competitive employment.

8.      The Undersigned shall not, at any time during the Engagement Period or thereafter, make use of any bidding information (or computer programs thereof) of any of the Managed Companies, nor divulge any trade secrets or other confidential information of any of the Managed Companies, except to the extent that such information becomes a matter of public record, is published in a newspaper, magazine or other periodical available to the general public or as CMI may so authorize in writing; and when the Undersigned shall cease to be engaged by CMI, the Undersigned shall surrender to CMI all records and other documents obtained by him or entrusted to him during the course of his engagement (together with all copies thereof) which pertain specifically to any of the businesses covered by the covenants in Section 7 or which were paid for by any of the Managed Companies; provided, however, that the Undersigned may retain copies of such documents as necessary for the Undersigned's personal records for federal income tax purposes.

9.      The following provisions shall apply to the covenants of the Undersigned contained in Sections 7 and 8:

         (A) the covenants contained in paragraphs (A) and (B) of Section 7 shall apply within all territories in which any of the Managed Companies are actively engaged in the conduct of business during the Engagement Period, including, without limitation, the territories in which customers are then being solicited;

C.V.

# NON-DISCLOSURE AGREEMENT

In consideration of $10 and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned (hereinafter "Undersigned"), hereby covenants and agrees as follows:

1. Undersigned acknowledges that in the course of his or her meetings, discussions and negotiations at or with Cammarata Management, Inc. ("CMI"), Undersigned will be exposed to valuable and confidential proprietary information or trade secrets of CMI and CMI's clients, including without limitation, customer lists, business plans and strategies and financial information. Undersigned agrees with CMI to hold all such information in trust and confidence and agrees that it shall be used only for the contemplated purposes, shall not be used for any other purpose, or disclosed to any third party. Undersigned shall take all necessary precautions against disclosure of such information to third parties and to employees, agents, or contractors of CMI who do not have a need to know.

2. Undersigned shall use CMI's confidential or proprietary information only to the extent necessary as authorized by CMI in writing and will not use or disclose such information without the prior written authorization of CMI.

3. Undersigned shall return all materials furnished to Undersigned by CMI, and all materials prepared by Undersigned in connection with Undersigned's review, evaluation and/or assessment of CMI's confidential information, including memoranda, notes, plans, records, reports and other documents (and copies thereof) relating to the business of CMI, promptly upon request by CMI.

4. Undersigned agrees that, in the event of the breach of the covenants contained in this Agreement, the harm to CMI would be irreparable and the remedy at law would be inadequate. Therefore, in addition to any other remedies sought by CMI, CMI may obtain injunctive or other equitable relief to cure, remedy or prevent such breach. Nothing contained in this Agreement shall require or be construed as to require the commission of any act contrary to any law, rule or regulation of any governmental authority, and if there shall exist any conflict between any provision of this Agreement and any such law, rule or regulation, the latter shall prevail and the pertinent provision or provisions of this Agreement shall be curtailed, limited or eliminated to the extent necessary to remove such conflict, and as so modified, this Agreement shall continue in full force and effect.

5. Undersigned understands that he or she has no contractual rights to any employment with CMI.

6. No waiver by any party of any breach or default hereunder shall be deemed to be a waiver of any preceding or subsequent breach or default. All waivers must be in writing, specify the breach or default concerned and be signed by the party against whom the waiver is sought to be enforced. The payment of any monies by any party shall not be deemed a waiver. This Agreement and the rights and obligations of the parties hereto shall inure to the benefit of and be binding upon the permitted assigns, successors and affiliated entities of the parties hereto.

7. In the event and to the extent that Undersigned is engaged by CMI to perform services or provide work, during such engagement period (the "Engagement Period") and for a period of one year thereafter, except with the prior written consent of CMI, Undersigned:

(A) shall not engage in any activities whether es employer, proprietor, partner, stockholder (other than _____

Scanned by CamScanner

including, without limitation, the territories in which customers are then being solicited;

(B) without limiting the right of CMI to pursue all other legal and equitable remedies available for violation by the Undersigned of the covenants contained in Sections 7 and 8, it is expressly agreed by the Undersigned and CMI that such other remedies cannot fully compensate CMI for any such violation and that CMI shall be entitled to injunctive relief to prevent any such violation or any continuing violation thereof;

(C) each party intends and agrees that if in any action before any court or agency legally empowered to enforce the covenants contained in Sections 7 and 8 any term, restriction, covenant or promise contained therein is found to be unreasonable and accordingly unenforceable, then such term, restriction, covenant or promise shall be deemed modified to the extent necessary to make it enforceable by such court or agency; and

(D) the covenants contained in Sections 7 and 8 shall survive the conclusion of the Undersigned's engagement by CMI.

10. Undersigned irrevocably submits to the jurisdiction of the United States District Court, Southern District of Florida ("Florida Federal Court") over any action or proceeding arising out of or relating to this Agreement and hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined only in such Florida Federal Court. Alternatively, if the Florida Federal Court be brought in any State Court of Florida in Palm Beach County having jurisdiction over the subject matter ("Florida State Court"), and Undersigned hereby irrevocably submits to the jurisdiction of the Florida State Court. As an alternative method of personal service, Undersigned irrevocably consents to the service of any and all process in any such action or proceeding by the mailing of copies at the address set forth below. Undersigned agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any manner provided by law. Undersigned further waives any objection to venue in such Florida Federal Court or Florida State Court and any objection to any action or proceeding in such Florida Federal Court or Florida State Court on the basis of forum non conveniens. Undersigned further agrees that any such action or proceeding brought hereunder shall be brought only in a Florida Federal Court or Florida State Court. Nothing in this paragraph shall affect the right of CMI to serve legal process in any other manner permitted by law. This Agreement shall be governed, construed and enforced in accordance with the substantive law of contracts of the State of Florida and without regard to Florida choice of law principles or conflicts of law principles.

11. UNDERSIGNED ACKNOWLEDGES AND AGREES THAT CMI INTENDS AND SHALL HAVE THE RIGHT TO VIGOROUSLY PURSUE ALL ITS RIGHTS AND REMEDIES, BOTH CIVIL AS WELL AS CRIMINAL, AT LAW OR IN EQUITY, IN THE EVENT OF A BREACH OR THREATENED BREACH OF THIS AGREEMENT BY THE UNDERSIGNED.

I have read the above. I understand its terms and agree they are reasonable. I agreed to be bound by them.

Dated: 5-11-15

_William Kyle Smithson_
Undersigned's Signature

_William Kyle Smithson_
Undersigned's Name (Print)

Address: _2925 Beasley Rd_
_Chapel Hill, TN 37034_

Scanned by CamScanner